EAST ARKANSAS LEGAL SERVICES, A Corporation

v.

LEGAL SERVICES CORPORATION, et al., Appellants.

No. 83–2118.

United States Court of Appeals, District of Columbia Circuit.

Argued June 1, 1984.

Decided Aug. 28, 1984.

Starr, Circuit Judge, dissented and filed opinion.

Appeal from the United States District Court for the District of Columbia (Civil Action No. 83–02813).

D. Clifford Crook, III, Washington, D.C., with whom Alan R. Swendiman, Washington, D.C., was on the brief, for appellants.

Thomas J. Mack of the Bar of the Supreme Court of California pro hac vice by special leave of the Court, with whom Alan Dockterman, Alexandria, Va., was on the brief, for appellee.

Before MIKVA and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge STARR.

MIKVA, Circuit Judge:

Since 1978, appellee East Arkansas Legal Services (EALS) has received annual grants from the Legal Services Corporation (LSC or the Corporation) to provide legal assistance to the poor. In 1983, LSC notified EALS that some of its remaining grant funds for 1983 would be withheld to offset unspent LSC funds which EALS had carried over from prior years. EALS brought this suit against appellants, the Corporation and three of its officials, to enjoin them from withholding any funds until the Corporation granted EALS a hearing pursuant to 42 U.S.C. § 2996j (1976 & Supp. V 1981) and 45 C.F.R. § 1606 (1983). The district court held for EALS and the Corporation appealed. *See East Arkansas Legal Services v. LSC,* Civil Action No. 83–2813 (D.D.C. October 4, 1983). We affirm.

## I. BACKGROUND

In 1974, Congress established the Legal Services Corporation as a non-profit corporation to provide legal assistance in civil matters to persons unable to afford adequate legal counsel. Legal Services Corporation Act of 1974, Pub.L. No. 93–355, 88 Stat. 378, 42 U.S.C. §§ 2996 *et seq.* In creating a corporation to administer the legal services program, Congress intended to ensure that the program would be independent and "free from any outside interference, political or otherwise." H.R.REP. No. 247, 93d Cong., 1st Sess. 3 (1973), *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 3872, 3874 (1974). Congress considered protection of the Corporation's independence to be a centerpiece of the Legal Services Corporation Act of 1974 (the Act).

The Act authorizes the Corporation to provide financial assistance to individuals, organizations, and state and local governments that provide legal assistance to the poor. 42 U.S.C. § 2996e(a)(1)(A). Pursuant to that authority, the Corporation currently provides annual grants to over 300 legal services programs throughout the country. The Act also establishes strong procedural protections for grant recipients. Before the Corporation reduces a recipient's grant award in a significant manner—whether through termination or suspension of financial assistance or through a denial of refunding at the end of the grant year—the recipient is entitled to notice and a hearing. *Id.* § 2996j.

For several years, the Corporation did not require the expenditure of grant funds in the year in which the funds were awarded. Under the policy set forth in the Corporation's "Audit and Accounting Guide for Recipients and Auditors", recipients

were permitted to carry over unspent funds into subsequent years, although each recipient was required to account separately for this "fund balance" in its annual audit. *See* Memorandum Opinion at 3, 9. Beginning in 1982, however, the Corporation began to develop a new policy designed to limit the amount of unspent funds which grant recipients could carry over into subsequent years. This case involves the Corporation's application of that new fund balance policy to EALS in 1983.

## A. *LSC's Development of a New Fund Balance Policy*

Since at least 1980, the Corporation has required every recipient with a fund balance exceeding ten percent of its LSC grant to submit a plan explaining how the recipient intended to spend those funds and over what period of time. In 1982, the Corporation decided to strengthen this policy through an effort to eliminate recipients' excess fund balances. In August, LSC staff prepared a memo for the Committee on Audit and Appropriations of LSC's Board of Directors (the Board), recommending two courses of action. First, the staff suggested that the Corporation take immediate action against any recipients whose fund balances exceeded fifty percent of their current grant. Those programs were to be notified, pursuant to the requirements of 45 C.F.R. § 1623 (1983), that their financial assistance would be suspended for thirty days unless they could show cause why the suspension should not take effect.

Second, the memo recommended that the Board approve a new policy to be applied during the 1983 grant year. Under that policy—which the full Board eventually adopted—recipients would be permitted to carry over only ten percent of their annual LSC grants. With respect to any carryover between ten percent and twenty-five percent of a recipient's annual grant, the Corporation would permit recipients to apply for a waiver of the ten percent ceiling. In no case, however, would a recipient be permitted to carry over anything in excess of twenty-five percent of its annual grant. The Corporation would recover fund balances exceeding the permissible levels by offsetting the recipient's current grant award.

The proposed policy could be enforced only if the Corporation knew the amount of funds actually carried over at the end of a program's fiscal year. Because that determination apparently could not be made prior to the beginning of the subsequent fiscal year, the memo recommended that a condition be included in all future grants, beginning with those for 1983. That condition would indicate that the recipient's new grant award would be offset by the Corporation if the recipient carried over impermissible levels of funds.

The Board's Audit and Appropriations Committee approved the general recommendations contained in the memo and directed the staff to prepare a resolution for Board action on the proposed new fund balance policy. Immediately following the Committee meeting, the Corporation took steps to suspend financial assistance to twenty-two grant recipients, including EALS, with fund balances in excess of fifty percent of their 1982 grants. Both the statute and the regulations require the Corporation to give a recipient reasonable notice and an opportunity to show cause why a suspension should not occur. 42 U.S.C. § 2996j(1); 45 C.F.R. § 1623 (1983). (All references to LSC's regulations refer to the regulations in effect in 1983 when the Corporation took the actions challenged in this lawsuit.) Pursuant to these regulations, LSC sent preliminary determination letters to twenty-two recipients notifying them of the proposed suspension. 45 C.F.R. § 1623.4(a). Two of the programs voluntarily returned sufficient funds to bring their fund balances below the fifty percent level. EALS was one of the sixteen programs that successfully challenged the preliminary determination.

Following the Committee meeting, the staff also prepared a resolution for Board consideration that set forth a new "instruction" regarding the Corporation's fund bal-

ance policy. (Instructions are policy guidelines adopted by the Corporation that are not codified in the Code of Federal Regulations.) The Board adopted the resolution on October 30, 1982, and, in November, a notice of the proposed new Fund Balance Instruction (the Instruction) was published in the Federal Register. 47 Fed.Reg. 53,-805 (1982). Following a comment period, the Board, at its December 1982 meeting, adopted the new fund balance policy, directed the staff to publish the final Instruction in the Federal Register, and approved a condition to be included in all 1983 grant contracts incorporating the provisions of the new policy. The Instruction was published in the Federal Register on January 6, 1983, and, pursuant to a statutory requirement that all rules, regulations, guidelines, and instructions be published thirty days prior to their effective date, the Instruction went into effect on February 5, 1983. *See* 42 U.S.C. § 2996g(e).

The Instruction required recipients to provide LSC with a statement of their fund balances from 1982 within ninety days after the close of the fiscal year. If a recipient's fund balance exceeded ten percent of its 1982 grant, it was permitted to apply within that same ninety-day period for a waiver of the ten percent ceiling so that it could retain up to twenty-five percent of its 1982 grant. The initial waiver decision was to be made by the Regional Office, but the Instruction permitted recipients to appeal the decision of the Regional Office to the Director of Field Services, whose determinations would be final. The Instruction provided that, "[i]n the absence of a waiver ... any fund balance amount in excess of 10% shall be set off against the recipient's annualized grant award for the next period by pro rata deductions from the remaining monthly allocations to the recipient." *Id.* The Instruction also provided that recipients would receive notice at least thirty days prior to any deduction in their monthly allocations. The Corporation began implementation of this new policy in early 1983.

The Corporation awarded its 1983 grants before the Instruction went into effect, but included a special condition in all grant awards regarding the newly adopted fund balance policy. That condition provided:

> Consistent with the Instruction on Recipient Fund Balances *to be published by the Corporation,* unexpended funds in excess of 10% of the recipient's 1982 support from the Legal Services Corporation, carried forward as a fund balance at the close of the recipient's 1982 fiscal year shall be set off against this grant award.
>
> A waiver of this provision to a maximum of 25% may be sought by application to the appropriate Regional Office within 90 days of the close of the recipient's fiscal year.

48 Fed.Reg. 561 (1983) (emphasis added).

### B. *Application of the New Fund Balance Policy to EALS*

EALS received its first grant of $191,000 from LSC in 1978. Although EALS carried over a significant amount of funds that year, the Corporation doubled EALS' grant in 1979 and increased it again in 1980. From 1980 until 1983, EALS received between $605,000 and $606,000 in new grant funds each year from the Corporation.

At the end of 1982, Congress approved a Continuing Resolution appropriating money to the Corporation and other agencies for fiscal year 1983. Joint Resolution of December 21, 1982, Pub.L. 97–377, 96 Stat. 1830. The Continuing Resolution required the Corporation to provide the same level of funding to grantees that it had provided them in 1982:

> [N]otwithstanding any regulation, guideline, or rule of the Corporation, the funds appropriated in this Act for the Legal Services Corporation shall be used by the Corporation in making grants or entering into contracts ... *so as to insure that funding for each such current grantee and contractor is maintained in 1983 at the annualized level at which each such grantee and contractor was funded in 1982,* or in the same proportion which total appropriations to the Corporation in fiscal year 1983 bear to the total

appropriations to the Corporation in fiscal year 1982, until action is taken by directors of the Corporation who have been confirmed in accordance with ... the Legal Services Corporation Act.

96 Stat. 1876 (emphasis added). Consistent with that resolution, EALS, which had received $605,000 from the Corporation in 1982, was awarded a grant of $605,274 for fiscal year 1983. (Although the Corporation's fiscal year runs from October 1 to September 30, the fiscal year for all of theCorporation's grant recipients runs from January 1 to December 31.) The Corporation pays out annual grant awards in eleven monthly installments. The first installment, provided in late December, provides two-twelfths of a recipient's total annual grant. The remaining installments are paid in one-twelfth increments at the beginning of each month from February to November. Consistent with that scheme, EALS' 1983 grant was disbursed in monthly installments of $50,522.

EALS' financial statement for fiscal year 1982 indicated that it had a fund balance of $173,841 as of December 31, 1982. Under the Instruction, EALS was entitled automatically to keep $65,298 of that fund balance, an amount equal to ten percent of EALS' 1982 annual grant plus investment income. In March 1983, pursuant to the Instruction, EALS applied for a waiver of the fund balance policy up to the full allowable amount of twenty-five percent. In its letter to the Corporation, EALS stated that its request for a waiver of the fund balance policy "does not constitute a waiver by said recipient of any claims it may have respecting the enforceability of the referenced instruction, the grant condition referred to therein, or the recapture policy generally." Defendants' Memorandum of Points and Authorities, Exhibit 8.

The Corporation granted EALS a waiver for $35,000 which was attributable to a one-time special needs grant, but it denied the rest of EALS' request. Pursuant to the Instruction, EALS appealed that decision. In an August 19, 1983, letter denying that appeal, EALS was told that it would have a total of $750,000 available to it in 1983: the $605,000 grant; the $65,000 carryover automatically permitted under the Instruction; and the $35,000 attributable to the special needs grant.

One week later, on August 25, 1983, LSC notified EALS that it intended to offset $83,543 of EALS' excess fund balance against EALS' 1983 grant award over a several month period. (The Corporation subsequently corrected its determination to $73,543—the amount of the fund balance which EALS was not permitted to carry over into 1983.) The letter to EALS (hereinafter referred to as the "offset notice") indicated that the amount to be offset would be deducted on a pro rata basis from EALS' monthly grant allocations beginning in October 1983, at the rate of $11,934 per month. The deduction amounted to approximately twenty-five percent of EALS' two remaining monthly grant allocations for 1983. EALS here challenges only the proposed reductions in those two 1983 monthly allocations.

Several days after receiving the offset notice, EALS responded with a request for a hearing pursuant to the Corporation's "Procedures Governing Termination of Financial Assistance and Denial of Refunding" set forth at 45 C.F.R. § 1606. In contrast to the Corporation's notice to EALS in 1982 regarding the proposed thirty-day suspension of financial assistance, the Corporation's offset notice did not suggest that the announced deductions constituted a "preliminary determination" triggering EALS' right to a hearing. EALS, however, treated the offset notice as a preliminary determination that its financial assistance from the Corporation was about to be terminated in part. It therefore requested an "informal conference" pursuant to 45 C.F.R. § 1606.6. On September 19, 1983, the Corporation denied EALS' request for a hearing on the ground that the offset did not constitute a "termination" of financial assistance within the meaning of the regulations. This lawsuit followed.

### C. *Proceedings before the District Court*

On September 23, 1983, EALS filed a complaint seeking declaratory and injunctive relief to prevent the Corporation and three of its officials from withholding funds from EALS' remaining 1983 grant allocations until the Corporation complied with the notice and hearing requirements of the Act and its implementing regulations. EALS also filed motions for a temporary restraining order (TRO) and a preliminary injunction. Following a hearing on September 23, the district court granted EALS' motion for a TRO. At a second hearing on September 30, 1983, the district court, with the consent of the parties, consolidated the motion for a preliminary injunction with a hearing on the merits of EALS' underlying claims. *See* Fed.R. Civ.P. 65. The district judge granted EALS' request for preliminary and permanent injunctive relief.

The court held that the Corporation's proposed withholding of funds constituted a "termination" within the meaning of 45 C.F.R. § 1606.2(a) (1983). It therefore found that EALS was entitled to a hearing pursuant to 42 U.S.C. § 2996j(2). The court further found that 45 C.F.R. § 1606.4 prohibits the Corporation from terminating a recipient's grant award on the basis of a policy that was not in effect at the time the grant was made. Because the Fund Balance Instruction did not take effect until after the Corporation had awarded EALS its 1983 grant, the court concluded that section 1606.4 precluded the Corporation from relying on the Instruction when it sought to reduce EALS' remaining monthly grant allotments for 1983. The Corporation and the three individual defendants noticed an appeal. They also filed a motion for summary reversal, which this court denied.

### II. ANALYSIS

The Corporation offers two grounds for reversing the district court. First, it contends that the proposed offset of funds did not constitute a "termination" within the meaning of the regulations and that, therefore, EALS was not entitled to a hearing. Second, it argues that, regardless of whether the offset can be characterized as a termination, EALS agreed to abide by the policies set forth in the as-of-yet unpublished Instruction, and was bound by that agreement. We reject both contentions.

### A. *LSC's proposed reduction in funds was a "termination."*

Congress directed the LSC to develop procedures for insuring that financial assistance to a recipient would not be terminated absent adequate notice and an opportunity for a hearing. The statute provides:

> [F]inancial assistance ... shall not be terminated, an application for refunding shall not be denied, and a suspension of financial assistance shall not be continued for longer than thirty days, unless the grantee ... has been afforded reasonable notice and opportunity for a timely, full, and fair hearing, and, when requested, such hearing shall be conducted by an independent hearing examiner. *Such hearing shall be held prior to any final decision by the Corporation to terminate financial assistance or suspend or deny funding.*

42 U.S.C. § 2996j(2) (emphasis added). The LSC's procedures governing the termination of financial assistance and denial of refunding are found at 45 C.F.R. § 1606. Those regulations define a "termination" as "a decision that financial assistance to a recipient will be permanently terminated *in whole or in part* prior to expiration of the recipients' current grant or contract." 45 C.F.R. § 1606.2(a) (emphasis added). A denial of refunding is a decision by LSC to refuse to refund a recipient or to reduce substantially the amount of the recipient's refunding at the end of a grant year. Under LSC's regulations, any reduction in a recipient's grant that is more than ten percent or more than $20,000 below the recipient's previous grant constitutes a "denial of refunding" that triggers the hearing requirement. *Id.* § 1606.2(b)(2). Thus any significant reduction in a recipient's funding—whether by termination, suspension

or denial of refunding—is subject to the notice and hearing requirements of the Act.

LSC contends here that a termination of financial assistance occurs only when a recipient's "annualized level of funding" is reduced prior to the expiration of a grant. That term does not appear in the Act or the regulations. LSC's brief defines a recipient's "annualized level of funding" as those funds which LSC insures will be *available* to a recipient during the fiscal year. In EALS' case, the Corporation established an "annualized funding level" for 1983 at $605,247. Because LSC permitted EALS to carry over $100,000 in excess LSC funds provided in prior years, and only sought to offset $73,000 in carryover funds, EALS had $705,000 in LSC funds *available* to it in 1983. Because EALS would still have over $605,000 in LSC funds available to it in 1983, LSC claims that its decision to recover approximately $24,000 in excess carryover funds by offsetting EALS' two remaining 1983 grant allotments did not constitute a "termination" of EALS' financial assistance in 1983.

EALS counters that the term "financial assistance" in the statute and the regulations refers to the money that LSC agrees to pay to a recipient during a fiscal year. Thus, under EALS' interpretation, a termination occurs when the grant award promised to a recipient during a fiscal year is reduced. The fact that LSC has permitted recipients to carry over funding from prior years should not diminish the Corporation's obligations under the current year's contract.

■ We agree with EALS' interpretation of the meaning of the word "termination." "[U]nless contrary indications are present, a court can assume that Congress intended the common usage of [statutory terms] to apply." *Inner City Broadcasting v. Sanders,* 733 F.2d 154, 158 (D.C.Cir.1984). Here, the statute refers to the termination of a recipient's "financial assistance," not, as the Corporation would suggest, to the reduction in a recipient's "annualized level of funding." The use of the term "financial assistance" in the statute and the regu-

lations indicates that the term refers to the amount of money actually paid to a recipient pursuant to a grant award, not to the amount of funds available to a recipient during a grant year.

The plain meaning of the language authorizing the Corporation to enter into agreements "to provide financial assistance to qualified programs" is that the Corporation has authority to pay out money to a recipient, not to ensure that money is *available* to that recipient from some other sources, including a *different* grant. *See* 31 U.S.C. § 6304 (1982) (defining a "grant agreement" as "the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—(1) the principal purpose of the relationship is *to transfer a thing of value* to the ... recipient to carry out a public purpose of support or stimulation authorized by a law of the United States") (emphasis added). Although the statute does not define the term "financial assistance," it authorizes LSC to provide such assistance by contract or grant. *See* 42 U.S.C. § 2996a(6); § 2996e(a)(1)(A). Thus the grant awards, which LSC provides annually and pays out in monthly allotments, are the measure of "financial assistance" which LSC provides to a recipient.

LSC's regulations also suggest that "financial assistance" refers to the money paid out to a recipient, not to the level of funding available to a recipient. Nowhere do the regulations refer to the *availability* of funds as a measure of a recipient's financial assistance. The provisions of the regulations providing for notice and a hearing when "financial assistance" is suspended or terminated are framed in reference to a recipient's "current grant." 45 C.F.R. §§ 1606.2(a), 1623.2.

LSC's own conduct in 1982, when it proposed to suspend financial assistance to twenty-two grant recipients, is consistent with a finding that "financial assistance" in both the statute and the regulations refers to the amount of money paid out to a recipient. The Act mandates two distinct

notice and hearing procedures for two different situations. In the first situation, where LSC intends to suspend financial assistance, a recipient is entitled to a hearing and an opportunity to show cause why the suspension should not take place. 42 U.S.C. § 2996j(1). In the second situation, where LSC intends to terminate financial assistance, deny refunding, or suspend financial assistance for more than thirty days, the procedures are more elaborate and the recipient is entitled to a full and fair hearing before an independent examiner. *Id.* § 2996j(2). The two procedures are similar, however, in that they both refer, in identical language, to reductions in "financial assistance." Similarly, LSC's regulations implementing these two provisions of the Act contain parallel language concerning the effect of LSC's actions on a recipient's "financial assistance ... prior to the expiration of the recipient's current grant...." 45 C.F.R. §§ 1606.2(a), 1623.2.

In 1982, LSC adhered to the more limited notice and hearing requirements of the statute and its own regulations when it proposed to suspend, for thirty days, the grant awards of recipients whose fund balances exceeded fifty percent of their current funding levels. That action is significant because it suggests that LSC considered that the term "financial assistance," in both the statute and in LSC's implementing regulations, refers to the amount of funds paid in the current year, not to the level of LSC funds *available* to a recipient in a given year. If LSC's interpretation of what it means to "terminate financial assistance" is correct, then it never would have had to provide notice and a hearing to those twenty-two recipients in 1982 for a proposed thirty-day "suspension of financial assistance." Those recipients carried over an amount of funds exceeding fifty percent of their 1982 awards; a suspension of one-twelfth of their 1982 awards would still have left them with *available* funds far exceeding the amount of their 1982 awards. If the proposed offset in this case was not a "termination" then, under LSC's theory, its proposed curtailment of

twenty-two recipients' monthly allotments in 1982 were not "suspensions" either.

We think that LSC properly concluded in 1982, as it should have with regard to the offset proposed against EALS in 1983, that suspension or termination of "financial assistance" refers to the amount of funding *provided a recipient in the current fiscal year*, not the amount of funding *available* to a recipient in the current fiscal year. Although the equities may have appeared to LSC to be different in those two situations—an unannounced thirty-day suspension of funding as compared to a deliberate move over several months toward a short-term twenty-five percent reduction in funding—the statute and LSC's own regulations, not LSC's present view of the equities, determine the procedures to be followed in both instances.

We also find that adoption of LSC's view of what constitutes "financial assistance" would seriously undermine the procedural safeguards which Congress established for LSC grant recipients. Congress has given LSC explicit authority to terminate financial assistance to any recipient that fails to comply with the many statutory requirements of the Act and with any rules, regulations and guidelines promulgated by LSC under the Act. *Id.* § 2996e(b)(1)(A). Congress made clear, however, that no such termination could occur until a recipient receives an opportunity for a "timely, full, and fair hearing." *See id.* §§ 2996e(b)(1)(A), 2996j(2). The notice-and-hearing requirement applies not only to terminations, but to any significant reduction in a recipient's funding, whether made during or at the end of the grant year. Thus whenever LSC decides to terminate assistance, deny refunding, or suspend assistance for more than thirty days, recipients have a right to a hearing and may demand that the hearing be held before an independent examiner. 42 U.S.C. § 2996j(2).

In most cases, Congress has been silent on the question of a grantee's procedural rights when an agency decides to terminate some or all of its federal grant. *See* R.

CAPPALLI, RIGHTS AND REMEDIES UNDER FEDERAL GRANTS 272 (1979). The panoply of due process rights established by Congress under the Legal Services Corporation Act distinguishes that statute from most other federal grant programs, yet LSC, through a semantic sleight-of-hand, would end-run the clear procedural protections which Congress provided LSC grant recipients. By characterizing EALS' 1983 grant award as a guarantee of an available pool of funds rather than as a commitment to provide new funds, LSC seeks to circumvent the hearing requirements mandated by Congress. Labelling its action a "recovery of prior assistance" does not alter LSC's obligation to provide EALS with a hearing that comports with the requirements of 42 U.S.C. § 2996j.

Any other conclusion would result in a circumvention of the due process rights which Congress bestowed upon LSC grant recipients. Under LSC's annualized level of funding theory, LSC could have decided to "recover" all $173,000 in carryover funds from 1982 in a lump sum without any notice or opportunity for a hearing and *regardless* of the effect that action might have had on the continuing operations of EALS and on the services provided to its clients. Such a result is contrary to the carefully drawn scheme of procedural rights created by the Congress to ensure that programs are not precipitously deprived of funding by LSC.

When it first created the Legal Services Corporation in 1974, Congress wanted to ensure that LSC and its grantees would be independent and free from outside interference. The notice and hearing requirements of the statute were one part of that scheme. In 1977, Congress strengthened the notice and hearing provisions to ensure that the hearing would be held, upon request, before an independent hearing examiner. Pub.L. 95–222, 91 Stat. 1619, 1624 (1977). The legislative history indicates that Congress intended that an independent examiner be available to a recipient "threatened with loss of funding." H.R. REP. No. 310, 95th Cong., 1st Sess. 15 (1977), *reprinted in* 1977 U.S.CODE CONG. &

AD.NEWS 4503, 4517. The House Report explained: "The provision will help to implement the statutory purpose of insulating Corporation decisions from political pressure, *and will insure that the final decision made by LSC will not be reached hastily, or on the basis of erroneous or incomplete information.*" *Id.* (emphasis added).

Congressional concern that legal services programs not experience sudden funding losses is further evidenced by the continuing resolution that required LSC to maintain the same level of funding in 1983 that it had provided recipients in 1982. Similar provisions have appeared in subsequent continuing resolutions, Pub.L. 98–107, 97 Stat. 733, 739 (1983); Pub.L. 98–151, 97 Stat. 964, 973 (1983), and in the FY 1984 Appropriations Act for the Departments of Commerce, Justice, State, the Judiciary and Related Agencies, Pub.L. 98–166, 97 Stat. 1071, 1088 (1983).

LSC made much of the fact that its offset decision was *not* reached hastily, and that EALS was on notice that LSC intended to implement the fund balance policy and even availed itself of the opportunity to seek a waiver of that policy in the spring of 1983. But the notice which EALS received and the waiver procedures it invoked did not comport with the hearing requirements *mandated by statute* and by LSC's own regulations.

At the end of 1982, LSC agreed by contract to provide EALS with $605,000 in financial assistance in fiscal year 1983 monthly allotments of $50,000. We hold that LSC's decision to reduce two of those allotments constituted a permanent "termination" of a portion of EALS' financial assistance in 1983, triggering the notice and hearing requirements of 42 U.S.C. § 2996j and its implementing regulations.

B. *Waiver of the Right to a Hearing*

On appeal, LSC argues that, even if the proposed offset was a "termination," EALS waived its right to a hearing under the statute and regulations because it ac-

cepted a condition in its 1983 grant whereby it agreed to be bound by the new fund balance policy. We need not reach the question of whether LSC may impose a grant condition on its recipients that requires them to waive procedural rights guaranteed by LSC's enabling statute and implementing regulations, for LSC did not raise that argument before the district court.

EALS' 1983 grant agreement was never made part of the record before the district court. The content of the grant condition was determined solely by reference to the published Instruction. Although LSC repeatedly referred to the grant condition in the proceedings before the district court, it did so in the context of asserting that EALS was on notice that its 1983 grant award might be offset pursuant to the new fund balance policy. In particular, LSC, in the context of opposing EALS' motions for a temporary restraining order and preliminary injunction, was trying to show that any "irreparable harm" to EALS was caused by its own failure to plan for the anticipated application of the new fund balance policy.

Furthermore, LSC's counsel indicated at both hearings that the sole issue before the district court was whether the offset was a "termination." LSC raises the waiver argument on appeal to counter EALS' claim that the proposed offset violated a provision of LSC's regulations that prohibits LSC from terminating a contract or grant based upon a policy that was not in effect when the grant was awarded. 45 C.F.R. § 1606.4. LSC's counsel in the proceedings below conceded that, if the offset were a "termination," then section 1606.4 would preclude LSC from withholding the funds. At the hearing on the motion for a temporary restraining order, LSC's counsel stated: "If you were to rule that this action was a termination of funding, then it would be the case that we could not terminate their funds based on a policy that we had enacted during the calendar year." Transcript of Hearing of September 23, 1983, at 34. According to counsel, the timing of the publication of the new Instruction was not relevant, because LSC contended that no termination had occurred. At the hearing on the preliminary and permanent injunction, LSC's attorney repeated this assertion: "[P]laintiffs are correct that our regulation prevents LSC from terminating a program on the basis of a policy that was not in effect at the time the grant was awarded." Transcript of Hearing of September 30, 1983, at 27–28. We find that the only question presented to and considered by the district court was whether LSC's proposed action with respect to EALS' two remaining 1983 grant allotments constituted a "termination" within the meaning of the statute and regulations. The waiver issue was not presented properly to the district court as an alternative argument and we refuse to consider it now.

### Conclusion

Although EALS sought to have LSC enjoined from withholding funds only until EALS received a hearing, it is doubtful that a hearing could serve any purpose here, for the sole basis for LSC's proposed offset was the Fund Balance Instruction that did not take effect until after EALS received its 1983 grant award. Accordingly, we affirm the judgment of the district court; LSC was required to comply with the requirements of 45 C.F.R. § 1606 before it could reduce EALS' 1983 grant allotments.

*It is so ordered.*

STARR, Circuit Judge, dissenting:

I respectfully dissent. The majority's decision unnecessarily requires the Legal Services Corporation (LSC) to provide East Arkansas Legal Services (EALS) with a hearing under 42 U.S.C. § 2996j (1976 & Supp. V 1981) and 45 C.F.R. § 1606 (1983) prior to withholding a portion of EALS' fiscal year 1983 (FY 1983) funds in order to offset unexpended funds carried over from FY 1982. In my view, the LSC's attempted offset of unspent carried over funds does not constitute a "termination" of "financial assistance" within the meaning of the ap-

plicable statute and regulations. Thus, I would hold that LSC was not required to provide EALS with a pre-termination hearing prior to effecting the offset.

Section 2996j(2) provides that

The Corporation shall prescribe procedures to ensure that —(2) financial assistance under this subchapter shall not be terminated, an application for refunding shall not be denied, and a suspension of financial assistance shall not be continued for longer than thirty days, unless the grantee, contractor or person receiving financial assistance under this subchapter has been afforded a reasonable notice and opportunity for a timely, full, and fair hearing, and, when requested, such hearing shall be conducted by an independent hearing examiner. Such hearing shall be held prior to any decision by the Corporation to terminate financial assistance or suspend or deny funding.

The procedures implementing this provision are found in 45 C.F.R. § 1606 (1983). The regulations specify a rather elaborate pre-termination notice and hearing procedure,[1] which is triggered by three specific types of actions affecting the level of funding of an LSC grantee—termination, suspension, or denial of refunding. The regulations define "termination," the funding action relevant to this case, as "a decision that financial assistance to a recipient will be permanently terminated in whole or in part prior to expiration of the recipient's grant or contact." *Id.* § 1606.2(a).[2]

As the majority recognizes, neither the statute nor the regulations define the term "financial assistance." The majority nonetheless concludes that termination of financial assistance includes termination of "the amount of money actually paid to a recipient pursuant to a grant award, not [ ] the amount of funds available to a recipient during a grant year." Majority Opinion at 1478. The majority reaches this conclusion by arguing that the "common usage" of the term "financial assistance" requires this construction. The majority further argues that the "plain meaning" of the statutory provisions governing the LSC grant-making process and the termination regulations support its interpretation.

Critically, the majority arrives at this "common sense" interpretation of these straightforward words only by overlooking the significance of the basic fact that grant awards to legal services providers are made on an *annual* basis and are calculated by means of a "minimum access figure."[3] Contrary to the majority's suggestion, the annual basis on which grants are awarded supports the LSC's argument that *a termination requires, at a minimum, a reduction of the annual funding level.* The annual basis of the funding of LSC grantees also suggests that termination,

1. The regulations provide for notification of the Corporation's "preliminary determination" that the grant should be terminated or refunding should be denied to the recipient, 45 C.F.R. § 1606.5; for an informal conference procedure at the request of the recipient, *id.* § 1606.6; and for a fact-finding hearing procedure to be conducted by an independent presiding officer. *Id.* §§ 1606.7–8. The regulations further specify that the Corporation has the burden of proof by a preponderance of the evidence on issues of fact, *id.* § 1606.11(a), and that the Corporation has the obligation of proving a "substantial basis" for its actions. *Id.* § 1606.11(b). After the hearing and any briefing of issues, the presiding officer issues a recommended decision, which is, in turn, reviewable by the President of LSC. *Id.* §§ 1606.13–.14.

2. The decision to terminate current funding may be based on several criteria. These criteria

permit termination or denial of refunding (1) when the denial or termination is "required by or will implement a provision of law, a Corporation rule, regulation, guideline or instruction, ... or a funding policy, standard, or criterion approved by the Board"; (2) when the recipient has substantially failed to comply with a provision of law, rule, regulation, or guideline; and (3) when "there has been substantial failure ... to use [ ] resources to provide economical and effective legal assistance." Funding may not be terminated during the current grant period on the basis of a rule, regulation, guideline or instruction "that was not in effect when the current grant was made or when the current contract was entered into." *Id.* § 1606.4.

3. In EALS' case, this figure is $6.20. Thus, the annualized funding level for EALS for FY83 was $605,274.

under the statute and regulations, does not refer to the recapture of *excess* surplus. Consistent with this interpretation of the statute and regulations, the offset attempted here in no way purports to cut off permanently EALS' financial assistance, in whole or in part. Rather, EALS' FY1983 funding is to be continued at its annualized rate. Indeed, there is no contention, nor could there be, that EALS' funds are being reduced below this normal level. The offset attempted here is intended only to recover unexpended FY82 funds carried over into FY83.

Moreover, the structure and express language of the regulations supports the view that "termination" does not occur when LSC attempts to recoup unspent funds. In particular, the regulations governing denials of refunding, contrary to the majority's assertion that the regulations do not mention "annual level" of funding, expressly refer to the annualized funding level. A denial of refunding parallels a termination of funding, except that a termination is effective at the time of the current grant, whereas a denial of refunding affects only future grants. 45 C.F.R. § 1606.2(a), (b). Thus, an examination of the criteria for "denial of refunding" is helpful in understanding the type of funding action encompassed by a "termination." The regulations state that a "denial of refunding" occurs when the recipient (1) "[w]ill not be provided with financial assistance"; (2) "[w]ill have its *annual level of financial support reduced to an extent*" that does not result from an overall reduction of LSC funding to legal services agencies and that is more than 10% or $20,000 below the recipient's *current level of assistance;* and (3) "[w]ill be provided with financial assistance subject to a new condition or restriction not generally applicable in other legal services agencies." *Id.* § 1606.2(b) (emphasis added). "Termination," by analogy, encompasses only reductions in the annual level of funding. Since there has been no reduction in the annual level of EALS' annual funding, no termination has occurred.

Neither the statute nor the regulations purport to require an elaborate hearing for every LSC action regarding funding. Rather, the statute and regulations require a hearing only for terminations, suspensions, and denials of refunding. The application of termination embraced by the majority would drain the term of all meaning. If an offset such as that attempted here requires a hearing, then it is difficult to see how an erroneous overpayment, for example, could be recovered without a hearing. In sum, the broad definition of termination adopted here would trigger the hearing procedure for each and every funding decision, an anomalous result compelled neither by the statute nor regulations.

Finally, it should not go unnoticed that the instant case is but a small portion of a much larger drama. Over the past few years, LSC has been engaged in an effort to remedy what appears to be a vexatious problem with excess fund balances being held by various LSC grantees. *See* Appellant's Brief 7–10. Pursuant to its grant-making authority under the Legal Services Corporation Act, 42 U.S.C. § 2996f, LSC is to "insure that grants and contracts are made so as to provide the most economical and effective delivery of legal assistance." As early as 1980, LSC developed guidelines aimed at limiting and controlling the amount of unspent, excess funds being retained by LSC providers. Despite that initial effort, the problem has apparently remained, and LSC, in 1982, ultimately developed the Fund Balance Instruction at issue in this case. The majority's decision, requiring as it does a hearing prior to recoupment of those excess, unspent funds, defeats the statutory prescription for the "economical and effective" legal services to the poor. That provision indicates Congress' clear intent that funds be utilized, not simply held, by legal services providers. Thus, the majority's requirement of a hearing prior to implementation of the recoupment of excess funds, rather than serving the noble goal of providing the needy with legal services, frustrates that goal.

In sum, nothing in the statute nor the regulations compels the majority's conclusion. The offset attempted here did not

rise to the level of a termination of financial assistance, and thus no hearing was required prior to its implementation. I therefore dissent.

