**MASSACHUSETTS LAW REFORM INSTITUTE, et al., Plaintiffs,**

v.

**LEGAL SERVICES CORPORATION, et al., Defendants.**

**Civ. A. No. 84–190.**

United States District Court, District of Columbia.

March 6, 1984.

Charles A. Horsky, Paul J. Tagliabue, Sonya D. Winner, Covington & Burling, Washington, D.C., for plaintiffs.

Joel P. Bennett, Eric J. Branfman, Bennett, Deso, Greenberg & Thomas, D. Clifford Crook, III, Asst. Gen. Counsel, Legal Services Corp., Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

### Introduction

In this proceeding, four state legal services centers seek to enjoin the Legal Services Corporation ("LSC" or "Corporation") from refusing to renew the centers' regional training grants for 1984. These plaintiffs receive grants from the LSC for the purpose of providing a variety of support services to local legal services programs. As one aspect of this support, the plaintiffs operate regional training centers which provide training and related services. These services contribute to the effectiveness of the local legal services programs and thus are of value to legal services clients.

The plaintiffs argue that the Corporation's decision not to renew their training center grants is contrary to the recently enacted appropriations measure, Pub.L. 98–166 (Findings of Fact ¶ 5, *infra*), and violates the procedural provisions of the Legal Services Corporation Act of 1974 ("LSCA" or "Act"), 42 U.S.C. § 2996 *et seq.* Specifically, the plaintiffs argue that the appropriations measure requires the Corporation to increase the funding for their training center grants, and that in any event, they are entitled to hearings before their funding may be terminated. They also argue that the Corporation has breached 1981 grant agreements with the plaintiffs.

1. The four plaintiffs are the Massachusetts Law Reform Institute, Inc. (Northeast Regional Training Center), Legal Services of Arkansas, Inc. (Southeast Regional Training Center), Legal Services Organization of Indiana, Inc. (Midwest Training Resource Center), and Colorado Rural Legal Services, Inc. (Western Regional Training Center).

2. The September 1981 grant agreements are attached as exhibits to the affidavits of Gilbert Glover (Executive Director, Legal Services of Arkansas, Inc.) (Exhibit 2), Allan Rodgers (Executive Director, Massachusetts Law Reform Institute, Inc.) (Exhibit 1), Israel Galindo (Executive Director, Colorado Rural Legal Services, Inc.) (Exhibit 1), and Norman Metzger (Executive Director, Legal Services Organization of Indiana, Inc.) (Exhibit 2). All of these affidavits

On January 20, 1984, this Court entered a temporary restraining order which required the Corporation to maintain a segregated account for the benefit of the plaintiffs, and to pay the plaintiffs a proportionate share of those funds. The Court renewed the order on January 30, 1984, and on February 10, 1984, the order was extended with the consent of the parties until the Court rules on the plaintiffs' motion for a preliminary injunction. The third order is similar to the earlier ones with the exception that the Corporation was unwilling to continue to make payments from the account.

The legal memoranda, affidavits, depositions, oral argument of counsel, and the entire record have been fully considered, and the Court finds that the plaintiffs have met the requirements for the requested equitable relief. Accordingly, a preliminary injunction should issue. The findings of fact and conclusions of law supporting this determination are set out below.

### FINDINGS OF FACT

1. Prior to the Corporation's challenged action, the plaintiffs—the four regional training centers [1]—had received grants for training activities since September of 1981. These grants were first issued by letter on or about September 21, 1981,[2] and were made pursuant to sections 1006(a)(1) and (3) of the Legal Services Corporation Act of 1974, 42 U.S.C. § 2996e(a)(1)(B), (3)(B).[3] In

were filed on behalf of the plaintiffs on January 19, 1984. The affidavits and depositions filed in this proceeding are referred to by the name of the affiant or deponent and the relevant portion of the document. The title of the affiant or deponent and the date of filing are cited in the initial reference to each document.

3. Section 2996e(a)(1)(B) authorizes the Corporation to:

make such other grants and contracts as are necessary to carry out the purposes and provisions of this title.

Section 2996e(a)(3) authorizes the Corporation to:

undertake ... by grant ... the following activities relating to the delivery of legal assistance [including] (B) training and technical assistance.

each case, the grants were made from fiscal year ("FY") 1981 funds for a "minimum of 12 months," and each grant stated that the LSC "anticipate[s] that additional funds will be available during the 1982 fiscal year." Special grant condition No. 12 provided that:

In the event that the Corporation's Congressional appropriation is not sufficient to enable the Corporation to renew this grant, at least sixty (60) days before the end of the grant term, the Corporation will notify the grantee that it does not intend to renew this grant.

2. The defendants are the Legal Services Corporation and Donald Bogard, the president of the Corporation and its chief executive officer. The LSC is a private, nonprofit corporation created "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a). The Corporation is specifically authorized to fund "training and technical assistance" programs. *See* n. 3, *supra*.

3. The LSCA provides that the Corporation shall be governed by an 11-member board of directors, appointed by the President of the United States with the advice and consent of the Senate. 42 U.S.C. § 2996c(a). At present, a full board of directors has not been confirmed by the Senate.

4. By letter of December 1981, the Corporation extended the September 1981 grant agreements in two separate contracts with the plaintiffs. In each case, the smaller of the two grants was for the period January 1, 1982 to December 31, 1982, *see, e.g.*, Rodgers Affidavit, Exhibit 2, and the larger grant was for the period October 1, 1982 to December 31, 1983.[4] *Id.*, Exhibit

3. The funds obligated for the later period were not carryover funds from previous years, and were specifically targeted for the operation of the training centers for the last three months of 1982 and all of 1983.[5] The grant agreements also cautioned that the grants "are awarded on a non-recurring basis and do not affect [the centers'] annual funding level" and that a decision not to renew the grants would not "constitute a denial of refunding within the meaning of section 1011 of the Legal Services Corporation Act," 42 U.S.C. § 2996j.

5. On December 21, 1982, Congress amended the LSC appropriations for FY 1983 by attaching an affirmative rider to a funding measure. The rider required that all current grantees receive 1983 grants equaling their 1982 grants, unless contrary action was taken by a legally confirmed board of the Corporation. H.J.Res. 631, Pub.L. 97–377, 96 Stat. 1830, 1876 (1982). Nearly identical language has since appeared in two subsequent continuing resolutions, Pub.L. 98–107, 97 Stat. 733, 739 (1983) and Pub.L. 98–151, 97 Stat. 964, 973 (1983), and most recently was incorporated for a fourth time in the FY 1984 Appropriations Act for the Departments of Commerce, Justice, State, the Judiciary and Related Agencies, Pub.L. 98–166, 97 Stat. 1071, 1088 (1983).

6. In September and October of 1981, LSC staff members and consultants visited the training centers to evaluate their activities, and subsequently discussed the performance of the centers in draft monitoring reports. The defendants admit that two of the training centers have excellent programs (Midwest and Western), the performance of the third is at least satisfactory (Northeast), and the fourth is substantially less effective (Southeast). Declara-

---

4. Although the grant letters stated that the funds were for a two-year period, special grant condition No. 1 attached to the grant letters barred the expenditure of those funds prior to October 1, 1982. Thus, the grants were intended to apply to the 15-month period from October 1, 1982 to December 31, 1983. The December 1981 grant agreements are attached as exhibits to the affidavits of Glover (Exhibits 3, 4), Rodg-

ers (Exhibits 2, 3), Galindo (Exhibits 2, 3) and Metzger (Exhibits 3, 3A).

5. The centers' fiscal year is synonymous with the calendar year for the purpose of receiving grants from the Corporation. *See* Memorandum of Plaintiffs in Support of Application for Temporary Restraining Order at 13 n. 1, filed Jan. 18, 1984; Metzger Aff. at ¶ 5.

tion of Gregg Hartley (Director, LSC Office of Field Services) at ¶ 48, filed Jan. 20, 1984; Hartley Dep. at 89–90, filed Feb. 15, 1984.

7. In October of 1983, the training centers submitted applications for refunding of their training center activities to the Corporation. Shortly after these submissions, Gregg Hartley, the Director of the LSC Office of Field Services, wrote letters notifying the plaintiffs that:

> Pursuant to the original grant award, Condition # 12, this is notification that the Corporation will not renew your grant.[6]

Condition No. 12, as previously discussed, stated that the Corporation could refuse to renew the plaintiffs' grants on the basis of insufficient funds. *See supra* at 1182. In addition, the letters explained the consequences of the LSC action:

> Your organization should begin to phase out the related grant activities including minimizing expenditures between now and the end of the year. A final audit will be required as of December 31, 1983
> . . .
> Any unused grant funds must be returned to the Corporation no later than January 31, 1984.[7]

The decision to deny the plaintiffs' refunding was not based on a determination that their performances were inadequate. Hartley Dec. at ¶ 35, Hartley Dep. at 90–91. The LSC has taken no action on the plaintiffs' applications for refunding, Hartley Dep. at 62–64, and has denied the plaintiffs the right to hearings on the decision not to renew their grants.

8. At the time Hartley prepared the October 1983 letters, he was aware that the LSC possessed more than $5 million of surplus funds for expenditure in FY 1984, Hartley Dep. at 65–66, which would be supplemented by Congressional appropriations for FY 1984. The Corporation re-

ceived FY 1984 appropriations in the amount of $275 million, a 14.1 percent increase over its 1983 appropriations. Pub.L. 98–166. The Corporation currently has approximately $6 million in surplus funds, more than $4 million of which are available for expenditure in FY 1984. Hartley Dep. at 65–69, Exhibit 10 at 19, 21, Exhibit 11.

9. a. The Northeast Regional Training Center received a $40,000 grant from the LSC for the period January 1, 1982 to December 31, 1982, and a $160,000 grant for the period October 1, 1982 to December 31, 1983. Rodgers Aff., Exhibits 2, 3.

b. The Western Regional Training Center received a $20,000 grant from the LSC for the period January 1, 1982 to December 31, 1982, and a $170,000 grant for the period October 1, 1982 to December 31, 1983. Galindo Aff., Exhibits 2, 3.

c. The Southeast Regional Training Center received a $90,000 grant from the LSC for the period January 1, 1982 to December 31, 1982, and a $130,000 grant for the period October 1, 1982 to December 31, 1983. Glover Aff., Exhibits 3, 4.

d. The Midwest Training Resource Center received a $55,000 grant from the LSC for the period January 1, 1982 to December 31, 1982, and a $135,000 grant for the period October 1, 1982 to December 31, 1983. Metzger Aff., Exhibits 3, 3A

10. Since the plaintiffs' fiscal year is commensurate with the calendar year, the funds received for expenditure in 1983 represent their grants for fiscal year 1983. Under this interpretation, the second, and larger of the two grants received by the plaintiffs pursuant to the December 1981 letters provides the base figure for calculating their entitlement to FY 1984 funding. In calculating the plaintiffs' 1984 grants, the sums referred to in the December letters must be decreased to reflect that 3 months of those funds were provided for 1982, not 1983. Lastly, the above fig-

---

**6.** Glover Aff., Exhibit 5; Rodgers Aff., Exhibit 5; Galindo Aff., Exhibit 5; Metzger Aff., Exhibit 7.

**7.** The defendants have recently retracted their demand that the plaintiffs return unused grant

funds to the Corporation. Transcript of Hearing on Motion for a Preliminary Injunction ("Transcript") at 36–37, filed Feb. 14, 1984.

ures must be increased by 14.1 percent to comply with the appropriations rider.

## LEGAL ANALYSIS

### The Standard for Injunctive Relief

■ Under the well-known standard set forth in this Circuit, four factors control the Court's discretion to grant a motion for a preliminary injunction: the likelihood that the plaintiff will prevail on the merits, the degree of irreparable injury that the plaintiff will suffer if the injunction is not issued, the harm to the defendant if the motion is granted, and the interest of the public. *Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921, 925 (D.C.Cir. 1958). In the event that the last three factors favor the issuance of an injunction, a movant can satisfy the first factor by raising a serious question on the legal merits of the case. *Washington Metropolitan Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843–44 (D.C.Cir.1977).

### A.

### Serious Legal Question and Substantial Likelihood of Success on the Merits

The plaintiffs' complaint presents three grounds for injunctive relief which are directed to the Corporation's refusal to renew the training center grants: failure to comply with the 1984 Appropriations Act, Pub.L. 98–166, failure to comply with the procedural provisions of the LSCA, 42 U.S.C. § 2996j and related regulations, and breach of the 1981 grant agreements. The two statutory arguments are particularly worthy of discussion under the first element of the *Virginia Petroleum Jobbers* test.

---

8. At this stage of the proceedings, the Court will treat the LSC decision as a denial of refunding because the denial apparently deprives the plaintiffs of financial assistance after the expiration of their grants. *See* 45 C.F.R. 1606.2(b)(1) (1983).

9. The defendants' contention that the plaintiffs do not receive "annual funding" within the

### 1.

■ First, the Court considers the contention that the decision to withhold funds [8] from the regional training centers is contrary to the 1984 appropriations rider. The rider directs the Corporation to:

> insure that total annual funding for each [ ] current grantee [funded under section 10006(a)(1) and (3) of the Act] is maintained in fiscal year 1984 in the same proportion which total appropriations to the Corporation in fiscal year 1984 bear to the total appropriations to the Corporation in fiscal year 1983, unless action is taken by directors of the Corporation prior to January 1, 1984, who have been confirmed in accordance with section 1004(a) of the Legal Services Corporation Act.

Pub.L. 98–166, 97 Stat. 1071, 1088 (1983).

The protection of the rider inures to the benefit of current grantees of the LSC who receive grants under section 1006(a)(1) and (3) of the LSCA. Under the terms of the December 1981 grant letters, the plaintiffs clearly have the status of current grantees. The letters prohibited the plaintiffs from expending the majority of the grant funds prior to October 1, 1982, and slated most of these funds for expenditure during 1983. The plaintiffs' status as recipients of funds under the stated provisions of the LSCA is equally certain. The September 1981 grant letters expressly provided that the grants were made pursuant to section 1006(a)(1)(B) and (3)(B).

The defendants have proffered no arguments which cast doubt on the plaintiffs' status as current grantees under the applicable portions of the statute.[9] Instead, they argue that the plaintiffs are not the beneficiaries of the statutory formula for the calculation of funding. This baseline

---

meaning of the statute does not seriously undermine the plaintiffs' argument. The references in the December 1981 letters to "annual funding" are best understood as a device to prevent a possible claim that the plaintiffs' 1981 or 1982 funding levels were increased by the provision of 1983 funds.

formula provides for a 14.1 percent increase in funding for qualified grantees in 1984. Under the defendants' view, a grantee's entitlement to increased funding arises only from the 1984 appropriations to the Corporation, and each grantee who received 1983 appropriations is entitled to a proportionate share of the increase provided by the 1984 appropriations. Since the plaintiffs did not receive funds from the 1983 appropriations, but instead received funds from an earlier measure, the defendants argue that Congress did not intend to include the plaintiffs within the reach of Pub.L. 98–166.

The weakness in this analysis is the assumption that the statutory formula is an additional requirement which the plaintiffs must meet in order to qualify for increased funding. On the contrary, the formula merely establishes the amount (14.1 percent) by which current grantees' funding is increased, it does not mandate that each grantee's increase must come from the 1984 appropriations. In fact, the statute does not specify the source of increased funds for current grantees of the LSC.[10]

Moreover, the legislative history of Pub.L. 98–166 supports the conclusion that the rider protects qualified grantees who were funded in 1983, as well as grantees who received a share of the LSC's 1983 appropriations. As Senator Hatch stated:

> The [affirmative rider] clearly states that *all* grantees *funded* in 1983 will continue to be funded in 1984 until there is action taken by Directors confirmed by the Senate.

129 Cong.Rec. S14448 (daily ed. Oct. 21, 1983) (emphasis added).

Furthermore, other remarks suggest that Congress was specifically concerned about increasing grants for training services. Representative Kastenmeier, the Chairman of the subcommittee of the House Judiciary Committee responsible for oversight of the operations of the Corporation, stated that the increased appropriations:

> will allow the Corporation to increase its funding of local programs, as well as training and support grants.

129 Cong.Rec. H9561 (daily ed. Nov. 9, 1983). The Corporation can meet Congress' demand to increase the funding of training grants in one of two ways: the LSC can either fund the plaintiffs or fund new grantees. The LSC is prohibited from changing the terms and conditions of current grants to provide for more training services. *National Senior Citizens Law Center, Inc. v. Legal Services Corporation*, 581 F.Supp. 1362 at 1370–1371 (D.D.C. 1984). A decision to fund new grantees would likely contravene Congress' expressed preference for current grantees, and would be inconsistent with the LSC's satisfaction with the current training programs.[11] Thus, both the language and legislative history of Pub.L. 98–166 strongly suggest that the plaintiffs are likely to prevail on their claim that the LSC decision to defund their grants was illegal.

In addition, the Congressional purpose in enacting Pub.L. 98–166 reinforces the conclusion that the training centers are entitled to receive increased appropriations. Congress enacted Pub.L. 98–166 and the three earlier appropriations measures with the broad intention of preserving the status quo pending Senate confirmation of a LSC Board of Directors. The stormy history of Senate confirmation of Reagan appointees to the LSC Board led to the Congressional decision to prevent a board of unconfirmed recess appointees from changing the funding levels of grantees or the terms and

---

**10.** This analysis is strengthened by the availability of other LSC funds for this purpose. The LSC admits that it has more than $4 million in surplus funds which are not yet obligated for 1984, in addition to the $275 million appropriations for FY 1984. This surplus is more than sufficient to fund the grants which the plaintiffs are entitled to under the Act.

**11.** The LSC has represented that it has plans to use the surplus funds for other purposes. *See* Transcript at 19. This statement suggests that the Corporation does not intend to fund new training grants, and implicates exactly the sort of discretion which Congress intended to preclude the Corporation from exercising in the absence of a confirmed Board.

conditions of their grants. *See* 129 Cong. Rec. S14446 (daily ed. Oct. 21, 1983) (statements of Senators Hatch and Rudman), S14448 (statement of Senator Weicker), S14449 (statement of Senator Kennedy). The legislative history of Pub.L. 98–166 does not suggest that grantees who have received funds for expenditure in 1983 are beyond the scope of this Congressional purpose. A decision not to renew the grants of this group of grantees is precisely the sort of policy change which is prohibited by the rider.[12]

### 2.

██ Second, the Court considers the plaintiffs' contention that the Corporation's decision not to refund the training centers is contrary to the procedural provisions of section 1011 of the LSCA. That section provides in relevant part that:

> an application for refunding shall not be denied ... unless the grantee ... has been afforded reasonable notice and opportunity for a timely, full, and fair hearing, and, when requested, such hearing shall be conducted by an independent hearing examiner.

42 U.S.C. § 2996j(2).

In this case, hearings have not been held with respect to the Corporation's decision not to refund the training centers. The defendants have refused to hold hearings because they contend that the LSCA does not mandate hearings under these circumstances, and that even if hearings are typically required, the plaintiffs have waived their rights to the procedural protection of section 2996j.

With respect to their first contention, the Corporation argues that the plaintiffs have not been denied refunding within the meaning of the statute, and are not "recipients" of "financial assistance" under the Act. The first assertion is plainly unsupported by the record in this case. The Corporation's regulations define a denial of refunding as:

> a decision that, after expiration of its current grant or contract, a recipient (1) will not be provided with financial assistance.

45 C.F.R. § 1606.2(b). Pursuant to the 1981 letters, the training centers received grants which expired on December 31, 1983, and these grants were not renewed by the LSC. On these facts, the regional training centers have presented a colorable claim that they were improperly denied refunding under section 2996j.[13]

██ The contention that the plaintiffs are not "recipients" of "financial assistance" is equally unconvincing.[14] A "grantee, contractor, or person or entity receiving financial assistance" is entitled to the procedural rights afforded by section 2996j; these rights are not confined to a subclass of "recipients," as defined by 42 U.S.C. § 2996a(6). The language of section 2996j suggests a broad interpretation of the classes of grantees entitled to its procedural protection, and the legislative history of the appropriations rider indicates that the present Congress believes that

---

**12.** Even if the plaintiffs grants are characterized as nonrecurring grants, they must still be refunded in 1984 because the statute provides no exception for one-time grants.

**13.** The plaintiffs have also made a plausible argument that they are entitled to interim funding under § 2996f(a)(9) because they receive grants "in connection with the provision of legal assistance to eligible clients" under 42 U.S.C. § 2996f(a). *See also* 42 U.S.C. § 2996f(b)(6) (emphasis added) (suggests that grants for "*training* of attorneys or paralegal personnel necessary to prepare them to provide adequate legal assistance to eligible clients" are in connection with providing legal services to eligible clients under § 2996f(a). The relevance of the

interim funding requirement to the question of irreparable harm is discussed *infra* at 1188.

**14.** The defendants' attempt to analogize the provision of legal training services to the provision of "computerized legal research or word processors," Transcript at 27, borders on the frivolous. Although the issue of the procedural rights of suppliers of word processing equipment is not now before this Court, there is an obvious distinction between a "grant which is necessary to carry out the purposes and provisions" of the LSCA, 42 U.S.C. § 2996e(a)(1)(B), and the grants to the plaintiffs, which directly relate to the "delivery of legal assistance," under 42 U.S.C. § 2996e(a)(3).

grantees such as the training centers are entitled to this protection.[15]

■ Second, the Corporation asserts that the plaintiffs have waived their hearing rights by accepting a disclaimer included in the December 1981 letters. These letters informed the plaintiffs that:

[f]ailure of the Legal Services Corporation to renew this one-time grant *next year* does not constitute denial of refunding within the meaning of section 1011 of the [Act]. Deposit and/or expenditure of any funds received under this grant will signify your acceptance of its terms and conditions.

*See, e.g.,* Rodgers Aff., Exhibits 2, 3 (emphasis added).

Contrary to the defendants' contention, the plaintiffs have not waived their hearing rights because the waiver only applies to the Corporation's refusal to renew the grants "next year," *i.e.* in 1982. In this case, the Corporation did not refuse to renew the plaintiffs' *1982* grants, but instead, refused to renew their *1983* grants. These actions are not within the literal scope of the asserted disclaimer.

This literal interpretation of the disclaimer is also supported by the Court's conclusion about the reason for including the disclaimer in the December letters. The disclaimer appears to reflect the Corporation's concern that the training centers, who were already funded for 1983 in 1981, might request additional funds in 1982 for expenditure in 1983. The disclaimer is best

understood as a warning that the LSC would not entertain successive requests for 1983 funds,[16] rather than as a questionable attempt to preclude the plaintiffs from exercising their statutory rights. Accordingly, the plaintiffs have shown that they are likely to succeed in their claim that they are entitled to hearings pursuant to 42 U.S.C. § 2996j.

### B.

#### *Irreparable Injury*

■ The plaintiffs must also establish that they will suffer irreparable injury if the Court does not issue a preliminary injunction. To make this showing, the plaintiffs must demonstrate that they have been harmed by the defendants' actions, and that relief at a later stage of the proceedings will not compensate them for their injuries.

■ Under the circumstances of this case, the Corporation's refusal to renew the training center grants injures the plaintiffs in several respects. Despite the fact that the defendants have recently authorized the training centers to expend unused 1983 grant money in 1984, the record suggests that the centers do not have sufficient funds to continue their operations for any significant period of time. The centers are responsible for completing numerous pending projects, and have also established timetables for undertaking new projects approved by the Corporation.[17] The una-

---

**15.** As Senator Hatch expressly stated:

if the Corporation decides to defund a grantee receiving funds under section 1006(a)(3) [42 U.S.C. § 2996e(a)(3) ], such a grantee would also be entitled to a full and fair hearing as prescribed in section 1011.

129 Cong.Rec. S14448 (daily ed. Oct. 21, 1983). It is undisputed that the plaintiffs in this case receive grants under § 1006(a)(3).

**16.** The fact that the September 1981 letters did not contain similar disclaimers supports the conclusion about the meaning of the disclaimers in the December letters. Although the September letters were identical to the December letters in most material respects, the September letters did not implicate a concern about double-dipping because the grants only provided

funds for 1981. Thus, the Corporation did not need to protect itself with disclaimers regarding future requests for funds.

**17.** Affidavits of John Cobb (Director, Western Regional Training Center) at ¶¶ 4, 6, Judith Rausch (Director, Midwest Resource Training Center) at ¶¶ 4, 6, Kenneth MacIver (Director, Northeast Training Center) at ¶¶ 3, 4, 6. These affidavits were filed on behalf of the plaintiffs on February 7, 1984. *See* Galindo Dep., Exhibit 2, filed Feb. 7, 1984; MacIver Dep. at 48–51, filed Feb. 7, 1984. The affidavit submitted by Daniel Nusbaum, the Director of the Audit Division of the LSC, does not refute the plaintiffs' submissions. Nusbaum Dec. at ¶ 3, Exhibit 2, filed Feb. 16, 1984.

vailability of alternative funding sources indicates that these projects will soon exhaust the plaintiffs' fund balances.[18]

Moreover, the centers' practice of planning projects months in advance of payment for the work performed is another element of irreparable harm. In the absence of continued funding, the centers will be forced to severely curtail the advanced planning activities which are an essential part of their operations.[19] Monetary relief in the future will not compensate the centers for these foregone planning opportunities.

The above findings, standing alone, are sufficient to establish that the plaintiffs will suffer irreparable harm in the absence of the requested relief. A party requesting a preliminary injunction need not show that "rigor mortis will set in forthwith" absent the requested relief. *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir.1966). Furthermore, the importance of preventing the Corporation from allocating its entire surplus to other recipients compels the issuance of preliminary relief. If the Corporation completes its plans to allocate surplus funds to other recipients,[20] the plaintiffs' ability to claim their share of these funds would be severely hampered in the event that the case is eventually decided in the plaintiffs' favor on the merits. For the above reasons, the plaintiffs have demonstrated a sufficient degree of irreparable harm to justify the grant of a preliminary injunction.

## C.
### *Harm to Other Interested Persons and the Public*

■ Lastly, the Court must consider the harm to the defendants and other interested persons, in addition to the public interest, in order to determine whether the equities favor the issuance of a preliminary injunction. The requested preliminary relief requires the defendants to provide the training centers with approximately the same monthly allotment of funds that they have received from the LSC since 1981, and the Corporation has ample surplus funds with which to comply with this requirement.[21] By mandating a 14.1 percent increase over the centers' 1983 funding, the injunction order imposes only a slightly higher burden on the Corporation than is imposed by the interim funding provision of the LSCA. 42 U.S.C. § 2996f(a)(9), discussed *supra* at 1186, n. 13. This increase, of course, is mandated by the terms of the 1984 appropriations rider.

Moreover, the Corporation's overall satisfaction with the performance of the centers suggests that the maintenance of the status quo does not place an undue burden on the LSC. In light of these factors, the requested relief imposes no significant harm on the defendants.

The public interest also favors the issuance of preliminary relief. The injunction implements Congress' demand that the Corporation provide increased funding for all current grantees for 1984, including grantees who provide training services. The injunction also furthers the statutory mandate that the Corporation provide legal

18. Affidavits of Mary Thomas (Manager, Southeast Training Center) at ¶ 6, filed Feb. 7, 1984, MacIver at ¶ 7, Rausch at ¶ 7, Cobb at ¶ 7.

19. *See, e.g.,* MacIver Dep. at 73; MacIver Aff. at ¶ 8; Cobb Aff. at ¶ 8.

20. Hartley Dep. at 74, Exhibit 10 at 29.

21. The defendants' concern that enforcement of this order will result in a floodtide of similar claims which will bankrupt the Corporation is unwarranted. The defendants have admitted that the procedural posture of the plaintiffs' case is unique, *see* Defendants' Answers to Plaintiffs' Interrogatories, filed Feb. 16, 1984, and the precise scope of the order is limited to grantees under 42 U.S.C. § 2996e(a)(3)(B). These grantees must also have received LSC funds targeted for expenditure in 1983, and have been denied continued funding from the 1983 appropriations. The declarations filed by the defendants fail to identify a floodtide of claimants who satisfy these requirements. *See* Declaration of Charles Ritter (LSC Vice President of Finance), filed Feb. 16, 1984; Supplemental Hartley Declaration at ¶¶ 6–13, 15, filed Feb. 16, 1984.

services "to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a). *National Senior Citizens Law Center, Inc.*, 581 F.Supp. 1362 at 1373.

## CONCLUSION

Based on the foregoing, the Court will enter an order granting the plaintiffs a preliminary injunction pending final disposition of the case on the merits. Counsel for plaintiffs shall present an order consistent with this Memorandum Opinion within 7 days of this date.