**MASSACHUSETTS LAW REFORM INSTITUTE, INC., et al., Plaintiffs,**

**v.**

**LEGAL SERVICES CORPORATION, et al., Defendants.**

**WESTERN CENTER ON LAW AND POVERTY, INC., Plaintiff,**

**v.**

**LEGAL SERVICES CORPORATION, et al., Defendants.**

**Civ. A. Nos. 84–190, 84–406.**

United States District Court, District of Columbia.

Dec. 19, 1984.

See also 592 F.Supp. 333.

Max L. Gillam, Nancy G. Scheurwater, Los Angeles, Cal., Irwin Goldbloom, Latham, Watkins & Hills, Washington, D.C., Mary Burdick, Richard A. Rothschild, Western Center on Law and Poverty, Inc., Los Angeles, Cal., for plaintiff in No. 844.

Joel P. Bennett, Sherrill R. Spatz, Bennett, Deso, Greenberg & Thomas, Richard N. Bagenstos, Legal Services Corporation Washington, D.C., for defendants in No. 84–406.

Charles A. Horsky, Paul J. Tagliabue, Sonya D. Winner, Covington & Burling, Washington, D.C., for plaintiffs in No. 84–190.

Joel P. Bennett, Eric J. Branfman, Bennett, Deso, Greenberg & Thomas, D. Clifford Crook, III, Asst. General Counsel Legal Services Corporation Washington, D.C., for defendants in No. 84–190.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### INTRODUCTION

This matter comes before the Court on the parties' cross motions for summary judgment in two related cases: *Massachusetts Law Reform Institute v. Legal Services Corporation* ("MLRI"), Civil Action No. 84–190 and *Western Center on Law and Poverty, Inc. v. Legal Services Corporation* ("Western Center"), Civil Action No. 84–406. The central legal issue presented is whether the defendant Legal Services Corporation ("Corporation" or "LSC") lawfully refused to renew the plaintiffs' regional training grants for fiscal year ("FY") 1984.

The plaintiffs in both actions operate regional training centers which provide training and related services to lawyers and indigent clients. The *MLRI* plaintiffs include the Massachusetts Law Reform Institute, Inc. (Northeast Regional Training Center), Legal Services of Arkansas, Inc. (Southeast Regional Training Center), Legal Services Organization of Indiana, Inc. (Midwest Training Resource Center), and Colorado Rural Legal Services, Inc. (Western Regional Training Center). The plaintiff Western Center on Law and Poverty, Inc. operates the training center for Region VIII. Each plaintiff is hereinafter identified by the name of the training center it operates.

Earlier in these proceedings, the Court considered the legality of the Corporation's decision to deny refunding to the *MLRI* plaintiffs. *MLRI*, 581 F.Supp. 1179 (D.D.C. 1984), *aff'd* 737 F.2d 1206 (D.C.Cir.1984). In granting those plaintiffs a preliminary injunction, the Court determined that the Corporation's action was contrary to the applicable federal law. Although Western Center was not a party to the *MLRI* proceeding,[1] the legal analysis and rationale of

---

1. Western Center filed suit shortly after the *MLRI* litigation ensued. It did not immediately press for injunctive relief on the training center issue, but rather, first challenged the termination of its state support grant. This grant was funded at a level which greatly exceeded its

that decision applies with equal force to all of the training centers. Certain issues concerning the timeliness of Western Center's application for 1984 funds and its request for prejudgment interest on its state support grant will also be resolved in this opinion.

The findings of fact and conclusion of law entered by the Court in granting the preliminary injunction in *MLRI* are adopted for purposes of deciding the pending summary judgment motions. These conclusions are reinforced by recent congressional action, *see* Pub.L. 98–411, 98 Stat. 1545 (1984), which confirms the correctness of the Court's initial ruling that the LSC's decision to deny refunding violated the FY 1984 Appropriations Act for the Departments of Commerce, Justice, State, the Judiciary and Related Agencies ("1984 Appropriations Act"), Pub.L. 98–166, 97 Stat. 1071 (1983), and the procedural provisions of the Legal Services Corporation Act of 1974 ("Act"), 42 U.S.C. § 2996 *et seq.* Accordingly, the Court grants the plaintiffs' motions for summary judgment in *MLRI* and *Western Center*. The reasons for that determination are set forth below. Where appropriate, the Court refers to its specific findings in *MLRI*.

## FACTUAL BACKGROUND

The LSC first awarded training grants to the centers in September of 1981.[2] These

grants were for a term of at least one year and provided funds for initial startup costs. The initial training grants were supplemented at the close of 1981. In two letters dated December 11, 1981, the LSC extended the terms of the September agreements and gave each *MLRI* plaintiff two additional grants. In each case, the smaller grant could be expended during the 1982 calendar year, while the larger grant was for the fifteen month period beginning October 1, 1982 and ending December 31, 1983.[3]

The funds obligated for the latter period were not carryover funds from previous years, and were specifically provided for the operation of the training centers for the last three months of 1982 and all of 1983. Although the award letters stated that the second grant was awarded for the 1982 and 1983 fiscal years, the funds could not be expended prior to October 1, 1982. Under the terms of the second supplemental grant agreements, the regional training centers in *MLRI* received the following grants: Northeast ($160,000), Western ($170,000); Southeast ($130,000), and Midwest ($135,000).[4]

In sum, the Corporation gave the centers advance funding for a two-year period. The grants were explicitly issued pursuant to the Legal Services Corporation Act of

training grant. Western Center has already prevailed in its argument that the Corporation illegally withdrew the state support funds. *Western Center v. LSC,* 592 F.Supp. 338 (1984).

**2.** The September 1981 grant agreements for the MLRI plaintiffs are attached as exhibits to the affidavits of Gilbert Glover (Executive Director, Legal Services of Arkansas, Inc.) (Ex. 2), Allan Rodgers (Executive Director, Massachusetts Law Reform Institute, Inc.) (Ex. 1), Israel Galindo (Executive Director, Colorado Rural Legal Services, Inc.) (Ex. 1), and Norman Metzger (Executive Director, Legal Services Organization of Indiana, Inc.) (Ex. 2). All of these affidavits were filed on behalf of the plaintiffs on January 19, 1984.

Western Center's agreement is attached as Exhibit A to the Declaration of Mary Burdick (Executive Director, Western Center), filed Aug. 24, 1984.

The affidavits, declarations, and depositions filed in this proceeding are referred to by the name of the author and the relevant portion of the document. The title of the author and the date of filing are cited in the initial reference to each document.

**3.** In this Memorandum Opinion, the four smaller grants are described as the first supplemental grants, while the four larger grants are referred to as the second supplemental grants. The December 1981 grant agreements are attached as exhibits to the affidavits of Glover (Exs. 3, 4), Rodgers (Exs. 2, 3), Galindo (Exs. 2, 3) and Metzger (Exs. 3, 3A).

**4.** Western Center received a single supplemental grant of $50,000 under the same terms and conditions as the second and larger of the grants received by the *MLRI* plaintiffs. Burdick Dec., Ex. B.

1974, 42 U.S.C. § 2996e(a)(1)(B), (3)(B).[5] The first type of grant funds general, support-related functions, while the latter covers training and technical assistance functions which relate to the delivery of legal services.[6] The grant agreements cautioned that they "are awarded on a non-recurring basis and do not affect your program's annual funding level" and that any decision not to renew the grants next year (i.e. 1982) would not "constitute a denial of refunding within the meaning of section 1011 of the Legal Services Corporation Act [42 U.S.C. § 2996j]." *See, e.g.* Rodgers Aff., Exs. 2, 3.

Prior to October 15, 1983, all of the training centers except Western Center submitted applications for refunding of their training center grants. Shortly thereafter, Gregg Hartley, the Director of the LSC Office of Field Services, wrote letters notifying the plaintiffs, including Western Center, that:

> Pursuant to the original grant award, Condition No. 12, this is notification that the Corporation will not renew your grant.[7]

Condition No. 12 provided that:

> In the event that the Corporation's Congressional appropriation is not sufficient to enable the Corporation to renew this grant, at least sixty (60) days before the end of the grant term, the Corporation will notify the grantee that it does not intend to renew this grant.

The timing of the nonrenewal letters was directly tied to the requirements of Condition 12. Since the last of the centers' three grants was to expire on December 31, 1983, the Corporation wanted to ensure that it complied with the sixty day notice provision. Hartley Dec. at ¶¶ 41–47, filed Jan.

20, 1984; Hartley Dep. at 94–96, filed Feb. 15, 1984.

This alleged shortage of funds, however, presents an unlikely justification for the decision to deny refunding to the plaintiffs. At the time Hartley prepared the October 1983 letters, he was aware that LSC possessed more than $5 million in surplus funds which could be expended in FY 1984. Hartley Dep. at 65–66. While the exact amount of LSC appropriations for FY 1984 had not been determined when Hartley drafted the letters, any new appropriations would certainly increase the available pool of funds for grant expenditures. The LSC in fact received FY 1984 appropriations of $275 million, at 14.1 percent increase over its 1983 appropriations. 97 Stat. 1088. By the start of 1984, the Corporation had approximately $6 million in surplus funds, of which more than $4 million were available for expenditure in FY 1984. Hartley Dep. at 65–69, Ex. 10 at 19, 21, Ex. 11.

Nor was the Corporation's decision related to its opinion of the centers' performances under the terms of the grants. Hartley Dec. at 35; Hartley Dep. at 90–91. The Corporation has admitted that two of the training centers have excellent programs (Midwest and Western). Hartley Dec. at 48; Hartley Dep. at 89–90. The performance of the Northeast Center has been at least satisfactory, and Western Center's performance has not been criticized. The Corporation is apparently less satisfied with the quality of services provided by the Southeast Regional Center. *Id.*

## LEGAL ANALYSIS

The plaintiffs challenge the Corporation's actions on two grounds: failure to

---

5. Section 2996e(a)(1)(B) authorizes the Corporation to:
   > make such other grants and contracts as are necessary to carry out the purposes and provisions of this title.
   In contrast, section 2996e(a)(3) authorizes the Corporation to:
   > undertake ... by grant ... the following activities relating to the delivery of legal assistance [including] (B) *training and technical assistance* (emphasis added).

6. Both types of grants can be distinguished from grants which cover *direct* delivery of legal services to eligible clients. *See* 42 U.S.C. § 2996e(a)(1)(A).

7. Glover Aff., Ex. 5; Rodgers Aff., Ex. 5; Galindo Aff., Ex. 5; Metzger Aff., Ex. 7, Burdick Dec., Ex. D.

comply with an affirmative rider attached to the 1984 Appropriations Act, Pub.L. 98–166 and failure to provide the procedural rights afforded by the Legal Services Corporation Act of 1974, 42 U.S.C. § 2996j.[8] The Court will first examine these two arguments, then consider the specific procedural posture of Western Center's request for refunding, and lastly, determine the amount of money the regional training centers are entitled to receive in 1984.

### A.

### Pub.L. 98–166: 1984 Appropriations Rider

The parties agree, as they must, that the affirmative rider to Pub.L. 98–166 imposed significant restrictions on the Corporation's discretion to limit funding of its current grantees in FY 1984. The rider specifically directed the LSC to

insure that total annual funding for each [ ] current grantee [funded under section 1006(a)(1) and (3) of the Act] is maintained in fiscal year 1984 in the same proportion which total appropriations to the Corporation in fiscal year 1984 bear to the total appropriations to the Corporation in fiscal year 1983, unless action is taken by directors of the Corporation prior to January 1, 1984, who have been confirmed in accordance with section 1004(a) of the Legal Services Corporation Act.

Pub.L. 98–166, 97 Stat. 1071, 1088 (1983).

Congress previously approved measures containing nearly identical language on three other occasions. *See* Joint Resolution of Dec. 21, 1982, Pub.L. 97–377, 96 Stat. 1830, 1876 (1982); Pub.L. 98–107, 97 Stat. 733, 739 (1983) and Pub.L. 98–151, 97 Stat. 964, 973 (1983). These measures were broadly intended to preserve the funding status quo for LSC grantees, and to insure that "legal service programs not experience sudden funding losses." *East Arkansas Legal Services, Inc. v. Legal Services Corp. ("East Arkansas")*, 742 F.2d 1472, 1480 (D.C.Cir.1984). In the absence of a congressionally confirmed Board of Directors, the LSC could not tip this carefully constructed balance.

A full Board has not as yet been confirmed, more than two years after Congress first took charge of the Corporation's grant-making authority. In this situation, it is undisputed that the Corporation cannot change the terms and conditions of the grants protected by the affirmative rider. Thus, the crucial question is whether the terms of the rider apply to the centers, who received training center grants.

The terms of the 1984 rider protect current grantees whose grants are provided under sections 2996e(a)(1) and (3) of the Act. The measure of each grantee's entitlement to funds is the grantee's total annual funding, multiplied by the ratio of the Corporation's 1984 appropriations to the Corporation's 1983 appropriations. Since the Corporation's 1984 appropriations were 14.1 percent greater than its 1983 appropriations, each qualified grantee may claim 14.1 percent more money than it received in 1983.

The plain language of Pub.L. 98–166 indicates that the regional training centers were entitled to receive this 14.1 percent increase. Their grants were funded under sections 2996e(a)(1) and (3) of the Act. They possessed the literal status of current grantees because they had received 1983 grants. Since the appropriations measure was enacted in 1983, the term "current" grantees would ordinarily include grantees who had received funds for expenditure during that year. "[U]nless contrary indications are present, a Court can assume that Congress intended the common usage of [statutory terms] to apply" *Inner City Broadcasting v. Sanders*, 733 F.2d 154, 158 (D.C.Cir.1984) (*cited with approval in East Arkansas*, 742 F.2d at 1478). Here, there is no evidence that Congress intended its language to have an

---

8. The third ground—breach of contract—need not be addressed in view of the Court's findings and rulings concerning the relevant federal law.

unusual meaning. Thus, grantees such as the training centers, who were given grants specifically targeted for expenditure in 1983, may claim the benefits of the rider.

The Corporation advances two hyper-technical arguments against this common sense interpretation. First, it argues that the plaintiffs did not satisfy the requirement that they receive "annual funding." Second, it asserts that even if the plaintiffs were recipients of annual funding, they must have received funds from *1983 appropriations* in order to be eligible for an increase. Since the centers' 1983 activities were all funded in advance from funds obtained from previous years' appropriations, the Corporation asserts that they are beyond the reach of the rider.

Unfortunately, the Corporation misconceives the relevance of its arguments. While the source of funds for the training grants is relevant to determining the *size* of the centers' 1984 grants, the source of the funds does not define the *reach* of the statute. The Court has previously rejected the Corporation's reasoning, *see MLRI*, 581 F.Supp. at 1184–85, and disagreed with the assumption that "the statutory formula is an additional requirement which the plaintiff must meet in order to qualify for increased funding." *Id.* at 1185.

Recent FY 1985 legislative developments confirm that this Court's initial conclusion was correct. In the Department of Justice and Related Agencies Appropriation Act, 1985, Pub.L. 98–411, 98 Stat. 1545, 1563, Congress has reconfirmed its long-standing commitment to continued funding for current LSC grantees. More specifically, the accompanying report from the Senate Appropriations Committee indicates that the regional training centers are entitled to an 8.2 percent increase over the funds received in 1984. S.Rept. No. 514, 98th Cong., 2d Sess. (1984). Once again, Congress has determined that grantees providing training services should receive increased funding. As Representative Kastenmeier stated one year earlier in reference to the 1984 appropriations measure:

it will allow the Corporation to increase its funding of local programs, as well as training and support grants.

129 Cong.Rec. H9561 (daily ed. Nov. 9, 1983).

The report also lays to rest the defendants' argument that Congress' statutory formula for the *calculation* of grant awards was intended to preclude the centers from qualifying for benefits. The report shows the Appropriations Committee's belief that Pub.L. 98–166 guaranteed 1984 funding for the regional training centers, regardless of the mechanics of the statutory formula. During its deliberations, the Committee obviously was aware that the centers were funded in 1984; if the Committee believed that the centers were funded in violation of Pub.L. 98–166, it would certainly have registered its disapproval. Its failure to do so suggests that the Committee was in complete accord with full funding for the centers.

Moreover, the Committee's ignorance of the precise impact of the statutory formula also shows that the formula was never intended as a bar to funding in 1984. In its report, the Committee expressed surprise that "inexplicably, [the centers were] funded in fiscal year 1984 entirely out of funds carried over from fiscal year 1983." S.Rept. at 56. Congress was obviously unaware that the centers had not received 1983 appropriations and thus were prevented by the formula from claiming funds from 1984 appropriations. The statutory formula forced the centers to seek 1984 funding from funds carried over from previous years.

On the other hand, it is not surprising that Congress was unaware of the intricacies of the Corporation's budget mechanics. It appears that the centers belonged to a very discrete group of grantees who received advanced funding from the Corporation, rather than being funded in the previous year for the next year's activities. If Congress had been aware of these complexities, it could have closed the loopholes which the Corporation has relied on throughout this litigation. Fortunately,

the Committee's recent statements guarantee continued funding for the centers in 1985, and foreclose arguments in the future which are similar to those already presented to this Court.

### B.
### 42 U.S.C. § 2996j(2): The Requirement of a Hearing

■ The procedural rights of the Act include the requirement that:

an application for refunding shall not be denied ... unless the grantee ... has been afforded reasonable notice and opportunity for a timely, full, and fair hearing, and, when requested, such hearing shall be conducted by an independent hearing examiner.

42 U.S.C. § 2996j(2). *See also* accompanying regulation at 45 C.F.R. § 1606. In *MLRI*, this Court held that "the plaintiffs have shown that they are likely to succeed in their claim that they are entitled to hearings pursuant to 42 U.S.C. § 2996j", 581 F.Supp. at 1187, and detailed the reasons in support of that conclusion. *Id.* at 1186–87. The defendants have presented no new factual or legal arguments which detract from that initial conclusion. Accordingly, the Court reaffirms its conclusion that the LSC was required to comply with the requirements of 45 C.F.R. § 1606 before it could deny refunding to the plaintiffs. Because the legal rights of Western Center are identical with those of the *MLRI* plaintiffs, this holding also includes Western Center.

In addition, the recent decision of this Circuit in *East Arkansas, supra,* confirms that the plaintiffs deserved the procedural rights afforded by section 2996j(2). There, the Court held that the LSC could not reduce its grantee's funds to offset unspent funds carried over from previous years without first providing a hearing. 742 F.2d at 1473. Although the precise issue presented—the definition of termination of financial assistance—differs from the issues in this case, the Court's analysis of 42 U.S.C. § 2996j is instructive. The Circuit Court stated that the hearing requirements were a "carefully drawn

scheme of procedural rights created by the Congress to ensure that programs are not precipitously deprived of funding by LSC." *Id.* at 1480. These procedural protections "ensure[d] that LSC and its grantees would be independent and free from outside interference." *Id.*

Here, the plaintiffs seek the same rights guaranteed by statute and approved in *Eastern Arkansas,* namely, the right to a hearing before refunding can be summarily denied. In response, the LSC argues that the centers are not recipients of financial assistance, and are thus not entitled to hearings. This argument amounts to "a semantic sleight-of-hand [which] would endrun the clear procedural protections which Congress provided LSC grant recipients." *Id.* The decision to deny hearings to the regional training centers was plainly unsupported by the language and purpose of the statute, and must be overturned.

### C.
### Western Center: Timeliness of Application for Refunding

■ The Court now considers whether the Corporation properly denied 1984 funding to Western Center. Although the preceding legal analysis applies to Western Center as well as to the *MLRI* plaintiffs, one additional issue is unique. That issue is whether Western Center is precluded from seeking funds because it failed to file a grant application by October 15, 1983, the asserted deadline for such applications. Despite the fact that Western Center protested the denial of funds three weeks later, LSC argues that it waived the right to any further challenge.

Under ordinary circumstances, the Corporation could deny refunding to a grantee on the grounds that the grantee failed to make a timely application for funds. Here, however, it is doubtful that the October 15 date constituted a firm deadline, and, in any event, other circumstances require that Western Center be funded.

First, the Corporation determined that the Center's grant would not be renewed because of insufficient congressional appropriations, *not* because the Center had failed to file a timely application for refunding. Burdick Dec., Ex. E (Letter dated Oct. 26, 1983). This letter was written *after* the October 15 deadline, when the Corporation could have asserted that Western Center had waived its right to continued funding. The fact that the Corporation did not rely on this justification suggests that it did not view the October 15 deadline as a prerequisite for continued funding.

The Corporation also asserted insufficient appropriations as the reason for refusing to renew the other four training grants. This suggests that LSC thought that Western Center's procedural position was indistinguishable from that of the training centers who filed "timely" applications. The Corporation's arguments to the contrary suggest that its heated clamor about the "mandatory" deadline is simply a desperate device to avoid refunding Western Center.

Second, the Corporation was in the process of revoking the training center grants *before* the receipt of the applications for 1984 funds. Although the record does not show the exact date when the Corporation decided to deny refunding of the training grants, it must have begun this process prior to October 26, the date the letters were written. *See* Hartley Dec. at ¶ 37–38. The regional training centers efforts in applying for refunding were thus futile, either at the time of the applications, or shortly thereafter. It is at best anomalous to argue that Western Center may not seek 1984 funds because it failed to follow a procedure which would not have resulted in refunding. *See Lodge 1858, American Federation of Government Employees v. Paine,* 436 F.2d 882, 896 (D.C.Cir.1970) (exhaustion of administrative remedies not required where attempt would be futile).

Third, the Corporation's rigid adherence to the October 15 deadline is inconsistent with Congress' express direction that the status quo should be maintained in the absence of a confirmed Board of Directors. *See discussion supra* at 419. Pub.L. 98–166 represents a strong congressional commitment to providing new funds to current grantees. This commitment would be seriously eroded by any decision to deny refunding which is premised on a rigid adherence to procedural requirements.

This provision does not mean that the Corporation could not deny funds to a current grantee who failed to comply with the substantive provisions of the Act or committed some other significant dereliction of duty. In the absence of some compelling justification, however, the Corporation may not deny refunding to a current grantee. Here, the Corporation has advanced no compelling reason to justify its denial of funds to Western Center. According to LSC, Western Center simply failed to apply for refunding by the applicable deadline. Whatever the merits of this argument, Western Center cured any defect by protesting the denial of funds several weeks later. In light of these circumstances, the Corporation may not assert a harmless fortuity as the basis for denying refunding to Western Center.

### D.

### The Statutory Formula: The Amount of 1984 Funds Due the Regional Training Centers

In *MLRI*, the Court calculated the amount of each center's entitlement to FY 1984 funds on the basis of the funds provided by LSC for expenditure during 1983. The Court limited these amounts to the funds awarded by the second supplemental grants because these were the only LSC funds provided for expenditure during the relevant time period. Three months of funding were excluded to reflect the fact that a portion of these grants could be spent in 1982, and the funds provided by the initial startup grants and the first supplemental grants were omitted. Those funds were targeted for expenditure prior to the close of 1982. Finally, the Court

stated that these amounts should be increased by 14.1 percent in accordance with the mandate of Pub.L. 98–166.

In their motions for summary judgment, the plaintiffs vigorously dispute several aspects of the Court's computations. The *MLRI* plaintiffs contend that the Court incorrectly excluded three months of funding from the centers' second supplemental grants, and erroneously omitted the first supplemental award in calculating the sums due the Northeast Regional Training Center and the Midwest Training Resource Training Center. These arguments are premised on documentary evidence which suggests that the Corporation subsequently approved the expenditure of these funds in 1983. In a related vein, Western Center argues that it is entitled to receive $117,000 in 1984, based on the amount of LSC funds it actually expended in 1983, increased by 14.1 percent. This amount includes most of the initial start up grant of $50,000, the supplemental grant of $50,000, and a portion of the interest earned on these funds. These contentions have already been considered and they are now rejected; the analysis set forth in *MLRI* is reaffirmed.

Although the plaintiffs have advanced creative arguments, they incorrectly emphasize factual issues involving the intent of various parties to the grant transactions. Instead, the provisions of Pub.L. 98–166 are the starting point for the analysis.

Under the terms of Pub.L. 98–166, the computation of most grantees' 1984 fund allotments is a simple matter. Congress directed that each LSC grantee should receive 1984 funds in an amount equal to its 1983 annual funding, increased by 14.1 percent. In most instances, a grantee's annual funding was equivalent to its 1983 appropriations. LSC's procedure for funding the training centers, however, complicates this relatively simple procedure. Since LSC provided the centers with funds from previous years' appropriations rather than 1983 appropriations, these appropriations cannot form the basis for the centers' 1984 funding. Thus, the Court's task is to identify which of the plaintiffs' LSC funds consti-

tute 1983 annual funds which are an appropriate substitute for 1983 appropriations.

A common sense appraisal of Pub.L. 98–166 and its funding formula suggests that the funds which LSC awarded for the 1983 calendar year bear the closest similarity to funds provided directly from 1983 appropriations. The purpose of the appropriations rider was to preclude any changes in the funding of LSC grantees. In order to effectuate this purpose, Congress provided a funding formula which measured the funds available to LSC grantees in 1984 by their receipt of 1983 appropriations. Congress apparently assumed that most grantees had utilized their 1983 appropriations to carry out their 1983 activities. If these appropriations were not spent during the same year, the formula would not have maintained the status quo. Thus, it is reasonable to conclude that the funds which the centers received for expenditure in 1983 stand in the shoes of funds which they otherwise would have received directly from 1983 appropriations.

LSC awarded funds for the 1983 calendar year in the second supplemental grants. These funds do not include the funds provided in the initial start up grants or the first supplemental grants. Both of these grants were provided for the grant period which ended by the close of 1982. The possibility that the Corporation may have authorized the expenditure of some of these funds in 1983 does not mean that these funds should be included in the calculation of the centers' 1984 funding. The inclusion of these funds would discriminate in favor of the regional training centers and against other LSC grantees whose 1984 appropriations were unaffected by carryover funds from previous years. Since Congress intended that all LSC grantees should be treated equally, the centers' 1984 funding should be determined by reference to the amounts which LSC initially provided for expenditure in 1983.

Moreover, these amounts must be decreased by one-fifth to take into account the provision of these funds for a fifteen month period, rather than a twelve month

period. A pro rata reduction ensures that the centers' 1984 funding is commensurate with the funds initially provided for expenditure during 1983. Lastly, these amounts due each regional training center must be increased by 14.1 percent under the terms of the appropriations rider.

Under this analysis, the training centers are entitled to 1984 funding in the following amounts, increased by 14.1 percent: Northeast Regional Training Center ($128,000); Southeast Regional Training Center ($104,000); Midwest Training Resource Center ($108,000); Western Regional Training Center ($136,000); and Western Center ($40,000).[9] Of course, the funds tendered to the *MLRI* plaintiffs should be decreased by the amounts already paid pursuant to the preliminary injunction and temporary restraining orders. In effect, this ruling continues the *MLRI* centers' funding for 1984 at the level already established in those previous orders, and provides funding for Western Center on a similar basis.

### E.

### Prejudgment Interest on Western Center's State Support Grant

Western Center also seeks an award of prejudgment interest on the $50,560 it was initially underpaid on the amounts due under its state support grant. This amount represents the difference between Western Center's rate of funding at its 1983 level and the 14.1 percent increase mandated by Congress for 1984 grants. Although LSC has apparently made timely monthly payments to Western Center at the 1983 level since January of this year, for the first six months of this period the payments did not include the 14.1 percent increase. Western Center did not receive this increase until September 21, 1984, when LSC made the $50,000 back payment. Accordingly, prejudgment interest is sought on the amounts underpaid each month, calculated from the date each monthly installment was due to the date of payment.

■ The availability of prejudgment interest is determined by the law which ap-

plies to the controversy. *Shaw v. Library of Congress*, 747 F.2d 1469, 1485 (D.C.Cir. 1984) (Ginsburg, J., dissenting). Under the federal law which applies here, an award of prejudgment interest is a matter within the Court's discretion. *Ambromovage v. United Mine Workers of America*, 726 F.2d 972, 980 (3d Cir.1984). The purpose of such an award is to compensate the prevailing party for the financial loss represented by his inability to use the money due him between the date his claim accrued and the date of judgment. The goal of prejudgment interest is compensatory, not punitive, and a finding of wrongdoing is not required. *Lodges 743 and 1746, International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. United Aircraft*, 534 F.2d 422, 447 (2d Cir.1975), *cert. denied*, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). Put another way, the award of prejudgment interest simply represents an attempt to make the plaintiff whole. *Turgeon v. Howard University*, 571 F.Supp. 679, 685 (D.D.C.1983).

Here, an award of prejudgment interest also reflects and effectuates the congressional purpose behind Pub.L. 98–166. This appropriations rider was designed to increase the 1984 funding of LSC grantees by 14.1 percent, beginning in January of 1984. An award of prejudgment interest carries out this intent by giving Western Center the financial equivalent today of the funds it was entitled to receive from LSC in earlier months. In the absence of this award, Western Center would not realize the full benefits mandated by the appropriations rider.

■ Accordingly, the Court determines that Western Center is entitled to prejudgment interest on the difference between the monthly installments owed on the state support grant and the amount actually paid. Although the parties have not ventured any opinion as the appropriate rate of interest, the Court concludes that the Corporation should pay prejudgment interest at the rate established in D.C.Code § 28–

---

**9.** The plaintiffs set forth the basis of these calculations at page 25 of their Memorandum in

Support of Summary Judgment, filed Oct. 1, 1984.

3302(c). *Turgeon v. Howard University,* 571 F.Supp. at 688 (Title VII); *Silver Hill Concrete Corp. v. Thomason Industries Corp.,* 556 F.Supp. 291, 295 (D.D.C.1982) (*Miller Act*), *aff'd* 704 F.2d 1294 (1983). This interest should be calculated from the date each installment should have been paid and September 21, 1984, the date of actual payment.

## CONCLUSION

■ The Court concludes that the Corporation's decision to deny 1984 refunding to the five regional training centers involved in these proceedings violated the FY 1984 Appropriations Act for the Departments of Commerce, Justice, State, the Judiciary and Related Agencies, Pub.L. 98–166, 97 Stat. 1071 (1983) and section 2996j(2) of the Legal Services Corporation Act of 1974. Appropriate orders granting the requested relief accompany this Memorandum Opinion. The order entered in Western Center incorporates the rulings made on August 13, 1984 granting partial summary judgment on the state support grant claim in favor of Western Center.

## JUDGMENT AND PERMANENT INJUNCTION

On the basis of the Court's Memorandum Opinion entered on this date, it is this 19th day of December, 1984, hereby

**DECLARED and ADJUDGED:** That defendants' notice of termination of plaintiffs' funding and denial of refunding was unlawful under Pub.L. 98–166, 97 Stat. 1071 (1983) and Section 1011 of the Legal Services Corporation Act, 42 U.S.C. § 2996j. And it is further

**ORDERED and DECREED:** That defendants are permanently enjoined from failing to remit to plaintiffs their 1984 funding for the regional training centers. Defendants shall, within ten days of this date, provide to each plaintiff 1984 funding in the following amounts, increased by 14.1 percent, less any amounts already paid under the Preliminary Injunction and other Orders in this action:

| | |
|---|---|
| Massachusetts Law Reform Institute, Inc. (Northeast Regional Training Center) | $128,000 |
| Legal Services Organization of Indiana, Inc. (Midwest Training Resource Center) | $108,000 |
| Legal Services of Arkansas, Inc. (Southeast Regional Training Center) | 104,000 |
| Colorado Rural Legal Services, Inc. (Western Regional Training Center) | 136,000 |

And it is further

ORDERED and DECREED: That plaintiffs shall administer the funds received from defendants in compliance with the Special Grant Conditions and other conditions of the 1981 grant agreements. And it is further

ORDERED and DECREED: That defendants shall take no action to order or otherwise cause plaintiffs to cease the future operations of the regional training centers. This paragraph does not preclude defendants from pursuing any lawful action to terminate the regional training centers for violations by plaintiffs of the Legal Services Corporation Act.

## JUDGMENT AND PERMANENT INJUNCTION

On the basis of the Court's Memorandum Opinion entered on this date, it is this 19th day of December, 1984, hereby

**DECLARED and ADJUDGED:** That defendants' notice of termination of plaintiff's funding and denial of refunding for its 1984 Region VIII regional training grant was unlawful under Pub.L. 98–166, 97 Stat. 1071 (1983) and Section 1011 of the Legal Services Corporation Act, 42 U.S.C. § 2996j. And it is further

**DECLARED and ADJUDGED:** That defendants' notice of termination of plaintiff's funding and denial of refunding for its 1984 state support grant was arbitrary, capricious and unlawful. And it is further

**ORDERED and DECREED:** That defendants are permanently enjoined from failing to remit to plaintiff its 1984 state support grant, computed by reference to its 1983 state support grant, and increased by 14.1 percent. These funds shall be remitted forthwith in accordance with the defendants' customary procedures, and shall include prejudgment interest calculated from the date each monthly payment was

due and September 21, 1984. And it is further

**ORDERED and DECREED:** That defendants are permanently enjoined from failing to remit to plaintiff its 1984 Region VIII regional training grant. Defendants shall, within ten days of this date, provide to plaintiff funding for its 1984 Region VIII regional training grant in the amount of $40,000, increased by 14.1 percent. And it is further

**ORDERED and DECREED:** That plaintiff shall administer the training center funds received from defendants in compliance with the Special Grant Conditions and other conditions of the 1981 grant agreements. And it is further

**ORDERED and DECREED:** That defendants shall take no action to order or otherwise cause plaintiff to cease the future operations of the Region VIII regional training center or its state support center activities. This paragraph does not preclude defendants from pursuing any lawful action to terminate plaintiff's funding for violations of the Legal Services Corporation Act, other than 1979 or 1980 activities relating to the plaintiff's efforts in representing clients opposed to Proposition 9 on the California ballot.